# Application of Establishment Clause to School "Voucher" Program

A draft bill proposing issuance of compensatory education certificates to parents of eligible school children would not on its face violate the Establishment Clause even if the certificates would be redeemable at religious private schools.

February 2, 1987

MEMORANDUM OPINION FOR ASSISTANT ATTORNEY GENERAL,
OFFICE OF LEGAL POLICY

This memorandum records our comments on the draft Education Consolidation and Improvement Act of 1987. We focus on the Establishment Clause concerns raised by the "compensatory education certificates" program which would be created under § 106 of the bill. For the reasons set forth below, we believe that the program is facially constitutional. We caution, however, that the bill, as drafted, may be vulnerable to "as-applied" challenges under certain circumstances.

I

Section 106 of the bill would amend Chapter 1 of the Education Consolidation and Improvement Act of 1981 (the Act) by adding a new § 560. That section would authorize a local educational agency ("LEA") receiving Chapter 1 assistance to provide "compensatory education certificates" directly to the parents of eligible children,[1] in either of two circumstances. First, the LEA could provide such certificates if it determined that to do so "would be more *effective* . . . than direct service provided by the agency in meeting the needs of [eligible] children." Section 560(a)(1) (emphasis added). Second, the LEA could issue such certificates if it determined that they were "needed to provide *equitable* services to either public or private school children." Section 560(a)(2).[2] Section 560(b) provides that an LEA shall make such determinations about the need for certificates "with respect to individual children, grades, schools,

---

[1] Section 560(h) defines "eligible child" as "an educationally deprived child selected to participate in a local educational agency's Chapter 1 program" in accordance with §§ 556(b)(1),(2) and 557 of the Act (codified at 20 U.S.C. §§ 3805(b)(1), (2), 3806).

[2] These two criteria, effective and equitable administration, are already required of Chapter 1 programs. *See* 20 U.S.C. §§ 3805(b)(4), (5), 3806

14

attendance areas, or any combination thereof, or may make such certificates available on a district-wide basis." Section 560(b) further requires an LEA to "apply the same criteria to public and private school children in determining the extent to which it will provide . . . certificates."

Section 560(d)(1) states that certificates may be redeemed by parents only for "purchase [of] compensatory education services that meet the identified educational needs of [an] eligible child."[3] Subsection (d)(2) provides that these services may be purchased "from any public or private school, wherever located, that the local education agency determines is able to provide appropriate and effective compensatory educational services to the child."[4]

In sum, when an LEA, applying established and neutral criteria, determines that its Chapter 1 program is functioning ineffectively and/or inequitably with respect to any individual child or any group of eligible children, the LEA may provide compensatory education certificates directly to the parents of such children. The parents may then redeem the certificates for compensatory services at the public or private school of their choice.

## II

The term "private school," as used in the draft bill, clearly encompasses both religious and non-religious private schools. Thus, it must be measured against the Supreme Court's Establishment Clause precedents dealing with aid to religious schools. This is an extraordinarily tangled area of the law, and many of the Court's decisions, when read together, are all but unintelligible. Nevertheless, the draft bill is sufficiently close to the programs upheld in *Witters* v. *Washington Department of Services for the Blind*, 474 U.S. 481 (1986), and *Mueller* v. *Allen*, 463 U.S. 388 (1983), that we believe that it survives facial constitutional scrutiny.

In *Witters*, the Court held that the Establishment Clause did not require a state to deny vocational assistance to a blind student merely because the student chose to apply the aid to religious training at a Bible college. Justice Marshall, writing for the Court, found that "any aid . . . that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients." 474 U.S. at 488 (footnote omitted). Consequently, the Court found that the aid program did not have the primary effect of advancing or inhibiting religion, and thus passed the second prong of the three-part test announced in *Lemon* v. *Kurtzman*, 403 U.S. 602, 612–613 (1971). The

---

[3] The draft bill would establish some safeguards on the redemption of the certificates. Section 560(c)(1) would require that the amount for which such certificates may be redeemed must be one "that is equitable to all children selected to participate" in the LEA's overall Chapter 1 program. Subsection (c)(2) would further provide that the amount that an individual parent may receive by redeeming his or her certificate "shall not exceed the cost of compensatory services incurred by the parent." Section 560(g)(3) would require LEAs applying for Chapter 1 funds to provide assurances that it will exercise due diligence to ensure that payments made to parents are used only for authorized purposes, and to recover any misused funds.

[4] Under § 560(e), an LEA would be permitted to use Chapter 1 funds to provide transportation to children whose parents choose to purchase compensatory services from schools outside the children's attendance area. That section would define such transportation expense to be "an administrative cost."

Court noted that the parties had conceded the first prong of the test, a secular purpose. 474 U.S. at 485–86. It declined to apply the entanglement prong until after the lower court had an opportunity to do so itself on remand. *Id.* at 753 n.5.[5]

In *Mueller*, the Court voted 5–4 to uphold a state tax deduction for educational expenses, despite the fact that over 90 percent of the tax benefits under the statute flowed to religious school students. The Court readily found that the statute had a secular purpose: "a State's decision to defray the cost of educational expenses incurred by parents — regardless of the type of schools their children attend — evidences a purpose that is both secular and understandable." 463 U.S. at 395. Turning to the effects prong of the test, the Court again emphasized the facial neutrality of the statute, together with the fact that "public funds become available [to religious schools] only as a result of numerous private choices of individual parents of school-age children." 463 U.S. at 399.[6] The Court found no excessive entanglement, despite the fact that state officials were charged with disallowing deductions for materials used in teaching religion. The Court stated simply that that type of decision did not differ substantially from other types of decisions previously upheld, such as those involved in textbook loan programs. 463 U.S. at 403.

Like the programs upheld in *Witters* and *Mueller*, the draft bill has a clear secular purpose. Moreover, it would dispense aid directly to parents pursuant to a facially-neutral standard. As a consequence, whatever aid might flow to religious schools (and, as a practical matter, it may resemble the proportions present in *Mueller*) would do so only as a result of the individual choices of parents. Thus, under *Witters* and *Mueller*, it would not have the impermissible "primary effect" of advancing religion. Finally, whatever "entanglement" might result from an LEA's duty to approve programs and monitor funds would approximate that sanctioned in *Mueller*. In sum, we think that the program proposed in the draft bill would fit within the holdings of *Witters* and *Mueller*, and hence be facially constitutional.

However, neither *Witters* nor *Mueller* involved a state officer in the determination of eligibility. Therefore, we wish to caution that if an LEA distributes certificates predominantly to religious school students — and especially if it

---

[5] Justice Marshall's opinion also referred to the fact that only a small portion of the state aid would in fact end up in the hands of religious schools. *See* 474 U.S. at 488. However, this portion of his analysis was effectively disavowed by five Justices writing separately. Justice Powell, joined by Chief Justice Burger and Justice Rehnquist, stated that "state programs that are wholly neutral in offering educational assistance to a class defined without reference to religion do not violate the second part of the *Lemon* . . . test, because any aid to religion results from the private choices of individual beneficiaries." *Id.* at 491 (Powell, J., concurring) (footnote omitted). This was true, he said, regardless of the percentage of "private choices" which ultimately benefited religious institutions. *See id.* at 491 n.3. Justice O'Connor also did not join the relevant portion of Justice Marshall's opinion. *See id.* at 493 (O'Connor, J., concurring in the judgment and concurring in part). Finally, Justice White reiterated his long-standing view that the "the Court's decisions finding constitutional violations where a state provides aid to private schools or their students misconstrue the Establishment Clause and disserve the public interest." *Id.* at 490 (White, J., concurring). *See also Mueller* v. *Allen*, 463 U.S. 388, 401 (1983) ("We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law.").

[6] The Court also cited several "characteristics" of the program, most notably the fact that the benefit was available for all parents. *See* 463 U.S. at 396–399.

16

does so on a school-wide basis, then it risks an as-applied challenge. Justice Powell's opinion in *Witters* emphasized that, in his view, a program must be "*wholly* neutral." 474 U.S. at 490–91 (Powell, J., concurring) (emphasis added). Likewise, in her separate opinion, Justice O'Connor stressed her own "reasonable person" version of the *Lemon* test: "no reasonable observer is likely to draw from the facts before us an inference that the state itself is endorsing a religious practice or belief." *Id.* at 493 (O'Connor, J., concurring in the judgment and concurring in part); *cf. Lynch* v. *Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring). As a practical matter, a facially neutral program like this one that nevertheless accords substantial discretion to state officials to determine the availability of certificates (and which may then result in certificates being issued predominantly to religious school students by virtue of such state rather than private decisions) might be insufficiently neutral in application and run afoul of the considerations outlined by Justices Powell or O'Connor, or both.

The chances of an as-applied challenge would diminish considerably, in our judgment, if the discretion of the LEA was more limited, thereby lessening the involvement of the state in the determination of the availability of certificates. In this regard, § 560 could provide that once the LEA determined that when a given percentage of eligible students were not being effectively or equitably served, certificates would be available on an area-wide or district-wide bases. This change would preclude any argument that an LEA administrator had favored religious schools by a determination under the effectiveness and equitability standards that predominantly resulted in the parents of children enrolled in religious schools being eligible for certificates.

DOUGLAS W. KMIEC
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
