Sue LUTHENS, et al., Plaintiffs,

v.

Gerald D. BAIR, Defendant.

Civ. No. 87–798–B.

United States District Court,
S.D. Iowa, C.D.

March 17, 1992.

Lee Boothby, Boothby & Yingst, Berrien Springs, Mich., Mark W. Bennett, Babich, Bennett & Nickerson, Des Moines, Iowa, for plaintiffs.

Gordon E. Allen, Marcia E. Mason, Gerald A. Kuehn, Attys. Gen., State of Iowa, Des Moines, Iowa, for defendant.

Edgar H. Bittle, Merle W. Fleming, Ahlers, Cooney & Dorweiler, Des Moines, Iowa, for amicus.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

VIETOR, Chief Judge.

This case presents the issue of whether a provision of Iowa's income tax laws that allows a taxpayer to claim an

income tax deduction or credit for payment of elementary or secondary school tuition and textbooks violates the Establishment Clause of the First Amendment to the United States Constitution.[1]

This suit was brought pursuant to 42 U.S.C. § 1983 by plaintiffs, all of whom are residents and taxpayers of the state of Iowa, against the Director of the Department of Revenue and Finance for the state of Iowa. Plaintiffs seek a declaration that the deduction/credit law and regulations promulgated thereunder are unconstitutional, and an injunction enjoining the defendant from effectuating and enforcing the law and the regulations. Trial was held to the court, and the parties have fully briefed the issues.[2]

Jurisdiction rests on 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

### FINDINGS OF FACT

(1) The plaintiffs are citizens of the United States and residents and taxpayers of the state of Iowa. Plaintiffs pay Iowa personal income taxes and have done so each year since the enactment of the challenged legislation.

(2) Defendant Gerald D. Bair is Director of the Department of Revenue and Finance for the state of Iowa and is responsible for effectuating and enforcing the revenue laws of the state. He is also responsible for the promulgation of such rules, regulations, and administrative policies as are necessary for the administration of those laws.

(3) During the 1989–90 school year there were approximately 480,000 students attending accredited elementary and secondary public schools in Iowa.

(4) During the 1986–87 school year approximately 49,454 students attended accredited nonpublic schools in Iowa, most of whom were enrolled in church-affiliated schools.

(5) Most of the students attending nonpublic schools are Catholic and most of the nonpublic schools are Catholic. There are also Lutheran, Baptist, Christian Reformed, Seventh-day Adventist, Fundamental Christian and Mennonite schools.

(6) Iowa requires that public schools be accredited, but has a voluntary accreditation program for nonpublic schools. Accreditation requires specific program area minimums, employment of certified staff, and passage and implementation of school governance policies. Many of these requirements are listed in Iowa Code § 256.-11.

(7) Accreditation for a nonpublic school is obtained by following the exact procedure as the public school, which includes annual filings, annual visits and desk audits. In 1989, there were approximately 230 accredited nonpublic schools in Iowa. Accreditation is within the jurisdiction of the state's Department of Education. *See* Iowa Code Chapter 256.

(8) A list of all accredited public and nonpublic schools exists and is open to the public.

(9) There are a few nonpublic schools in Iowa that are not accredited. These schools either do not meet the section 256.11 standards or have chosen not to seek accreditation—some because they do not want the state to have any involvement with them.

(10) To a greater or lesser degree, each accredited nonpublic church-affiliated school has educational goals of aiding the students in their religious, intellectual, social, physical and emotional development. Most have mandatory courses in religion and have religious symbols on the school premises; some open each class with a

---

1. In their complaint, plaintiffs also allege that the tax law in question violates the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs appear to have abandoned those theories. In any event, I find and conclude that plaintiffs have not proved that the tax law in question violates the Free Exercise and Equal Protection Clauses.

2. With the court's permission, the Iowa Association of School Boards, Inc. and the National School Boards Association have filed a joint amici brief in support of the plaintiffs.

prayer. Some provide other religious exercises, such as a weekly mass. Religious values are commonly incorporated into the process of teaching subjects legally and commonly taught in the public schools, such as social studies, science, mathematics and English-language arts.

(11) Division II of Chapter 422 of the Iowa Code imposes personal income taxes. Division II spans sections 422.4 through 422.31, inclusive.

(12) In 1987, the Iowa Legislature enacted legislation adding to Iowa Code §§ 422.9 and 422.12 new subsections that provide for tuition and textbook deductions or credits on personal income tax returns. Under this legislation, taxpayers who have adjusted gross income of less than $45,000 and who have one or more dependents attending grades kindergarten through twelve in an accredited school in Iowa may claim an additional itemized deduction, not to exceed $1,000 per dependent, for amounts paid for tuition and textbooks. Iowa Code § 422.-9(2)(f). Taxpayers who take the standard deduction may claim a tax credit equal to 5% of the first $1,000 paid for tuition and textbooks for each of such dependents. Iowa Code § 422.12(2).

(13) The deduction or tax credit is allowed only for amounts paid for tuition and textbooks for dependents who attend a school in Iowa which is accredited under Iowa Code § 256.11, which is not operated for profit and which adheres to the provisions of the United States Civil Rights Act of 1964 and the Iowa Civil Rights Act of 1965, Chapter 601A of the Iowa Code.

(14) "Textbooks" for which the deduction or tax credit is allowable are defined in the law as:

books and other instructional materials and equipment used in elementary and secondary schools in teaching only those subjects legally and commonly taught in public elementary and secondary schools in this state and *does not include instructional books and materials used in the teaching of religious tenets, doctrines, or worship, the purpose of which is to inculcate those tenets, doctrines, or worship*, and does not include books or materials for extracurricular activities including sporting events, musical or dramatic events, speech activities, driver's education, or programs of a similar nature.

Iowa Code §§ 422.9(2)(f) and 422.12(2) (emphasis supplied).

(15) "Tuition" for which the deduction or tax credit is allowable is defined in the law as:

any charges for the expenses of personnel, buildings, equipment and materials other than textbooks, and other expenses of elementary or secondary schools which relate to the teaching only of those subjects legally and commonly taught in public elementary and secondary schools in this state and *which do not relate to the teaching of religious tenets, doctrines, or worship, the purpose of which is to inculcate those tenets, doctrines, or worship*, and which do not relate to extracurricular activities including sporting events, musical or dramatic events, speech activities, driver's education, or programs of a similar nature.

Iowa Code §§ 422.9(2)(f) and 422.12(2) (emphasis supplied).

(16) To implement the exclusion of "religious tenets, doctrines or worship" and "extracurricular activities" in respect to tuition, a Department of Revenue and Finance regulation provides for a proration of tuition charges. The regulation provides:

Proration of amounts paid for tuition which pertain to classes for subjects legally and commonly taught in public schools in Iowa. To the extent that the total amount paid to a school for tuition for a dependent attending grades kindergarten through 12 at a primary or secondary school, pertains to classes for subjects legally and commonly taught in public schools in Iowa, the amount paid is deductible. In instances where there are separate tuition charges for extracurricular activities or for classes for religious instruction, those tuition charges do not qualify for the deduction for tuition and textbooks. However, in situations where the total tuition charges of a

school for a dependent cover extracurricular activities and classes for religious instruction as well as classes for subjects legally and commonly taught in public schools in Iowa, a proration of the tuition must be made to determine the portion of the tuition charges that are deductible. The tuition deduction for a dependent may be calculated on the basis of the time spent by the dependent in classes for subjects legally and commonly taught in Iowa's public schools to the total time spent by the dependent in school. For example, a taxpayer paid $500 to a private school for tuition for a dependent for a semester. During the semester, the dependent had eight class periods each school day. The dependent spent one period in a class for religious instruction. The dependent had another period in the school day spent in practice for an extracurricular activity. The dependent spent the rest of the school day in classes for subjects legally and commonly taught in Iowa's public schools. Seventy-five percent of the dependent's time at the school was spent in classes for subjects legally and commonly taught in Iowa's public schools. Therefore, 75 percent of the tuition paid for the semester or $375 qualifies for the deduction for tuition and textbooks.

(17) A tax deduction may be allowed only if the taxpayer can establish the validity and correctness of such deduction. Iowa Administrative Code § 701–38.4(422).

(18) The Director of the Audit and Compliance Division of the Department of Revenue and Finance has the power to examine returns and to make audits as well as to determine the correctness of the amount of the tax due. Iowa Administrative Code § 38.8.422.

(19) If the Department of Revenue and Finance discovers discrepancies in returns, it is authorized to notify the taxpayer of this discovery by ordinary mail, and thereafter the taxpayer has 60 days to appeal an assessment to the Director. Iowa Code § 422.28.

(20) If the taxpayer commences a contested case, the Department of Revenue and Finance has the authority to subpoena books, papers, and records and shall have all other subpoena powers conferred by law. Iowa Administrative Code § 7.13(17A).

(21) In the event a taxpayer contests denial of a claimed tuition tax deduction or a tax credit, the Department of Revenue and Finance has the authority to subpoena not only the books, papers, and records of the taxpayer, but also those of the school.

(22) Under the Iowa Administrative Code, a deduction from gross income, otherwise allowable, will not be allowed in cases where the Department of Revenue and Finance requests the taxpayer to furnish information sufficient to enable it to determine the validity and correctness of the deduction, until such information is furnished.

(23) Under the Iowa Administrative Code, the taxpayer is required to retain those records relating to deductions for as long as the contents may be material in the administration of the Iowa Tax Code under the statute of limitations for audit specified in Iowa Code § 422.25. Iowa Administrative Code § 38.3(422).

(24) There were approximately 182,200 1040A Iowa income tax returns filed for the 1987 tax year.

(25) There were approximately 1,035,200 1040 Iowa income tax returns filed for the 1987 tax year.

(26) Approximately 23,952 Iowa income tax returns filed for the 1987 year claimed a tuition and textbook deduction, and approximately 11,170 returns made a claim for a tuition and textbook tax credit. The deductions totalled approximately $6.9 million with an actual tax benefit of about $524,000, and the tax credits totalled about $153,000.

(27) In 1991, 287 returns for the tax year 1987 were audited in respect to tuition/textbook deductions or credits. All audits were done by letter. There were no personal contacts. One hundred forty-six of those audited were assessed additional tax, averaging $130 per return. The predominant reason for the errors included:

(1) the taxpayer failed to prove $1,000 of expenses; (2) the taxpayer claimed expenses of college education; and (3) the taxpayer claimed expenses of extracurricular activities. The 1991 audits did not review the content of the classes. The class schedule demonstrating the course title was acceptable documentation for the deduction or credit. No textbook review occurred.

(28) As of February 21, 1989, the Iowa Department of Revenue and Finance had not issued any subpoena in an effort to obtain any books, papers, or records relating to a taxpayer's claim for a tuition or textbook deduction or credit.

(29) As of February 21, 1989, the Iowa Department of Revenue and Finance had not contacted any nonpublic schools relative to a taxpayer's claim for tuition and/or textbook tax deduction or credits.

(30) The Iowa Department of Revenue and Finance takes the position that Iowa Code § 422.20(3) protects from disclosure the procedure the Department of Revenue and Finance has established to determine whether a tuition or textbook deduction or credit has been properly claimed by a taxpayer.

(31) As of February 21, 1989, the Iowa Department of Revenue and Finance had not utilized its procedure to determine whether a tuition or textbook deduction or credit had been properly claimed by any taxpayer.

(32) The Iowa Department of Revenue and Finance intends to implement a selective audit program to review some of the tax returns claiming the tuition or textbook tax deduction or credit; however, as is the case with any other deduction or credit, the department does not have the personnel resources to audit every return to insure the accuracy of every deduction or credit taken.

(33) Passage by the legislature of the deduction/credit law, for which some religious groups lobbied, has engendered some strain in relationships between those who favor the law and those who do not favor it.

## DISCUSSION AND CONCLUSIONS OF LAW

The First Amendment to the Constitution of the United States provides, *inter alia:* "Congress shall make no law respecting an establishment of religion * * *." This provision is framed as a limitation on the authority of the federal government, but it is applicable to the states through the Fourteenth Amendment. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

When the First Amendment was adopted, there was "a widespread awareness among many Americans of the dangers of a union of Church and State." *Engel v. Vitale,* 370 U.S. 421, 429, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962). They knew that government-sponsored religion elicits "the hatred, disrespect and even contempt of those who [hold] contrary beliefs." *Id.* at 431, 82 S.Ct. at 1267. Chief Justice Burger, in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), expressed the establishment prohibition concept well:

> Under our system the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of the government. The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice * * *.

*Id.* at 625, 91 S.Ct. at 2117. The Supreme Court, however, has not held that the Establishment Clause requires "total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable." *Id.* at 614, 91 S.Ct. at 2112.

In 1971, in *Lemon,* the Supreme Court announced the now familiar three-part test for determining whether a challenged governmental practice is permissible under the Establishment Clause of the First Amendment: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion

\* \* \*; finally, the statute must not foster 'an excessive government entanglement with religion.' " *Id.* at 612–13, 91 S.Ct. at 2111 (citations omitted). If the government action under challenge "violates any of these three principles, it must be struck down under the Establishment Clause." *Stone v. Graham,* 449 U.S. 39, 40–41, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980).

There is widespread speculation that the Supreme Court is on the threshold of modifying or abandoning the *Lemon* test in favor of another standard that would be more accommodating of relations between government and religious organizations. *See* 60 U.S.L.W. 3351–53 and defendant's Proposed Findings of Fact and Conclusions of Law, pp. 25–26. Be that as it may, the *Lemon* test is the currently applicable test and it is my obligation to apply it in this case.

■ The court is not writing on a clean slate. A substantially similar case involving a Minnesota statute passed constitutional muster nine years ago in *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). The Minnesota statute permitted a taxpayer to deduct from gross income the following:

Tuition and transportation expense. The amount he has paid to others, not to exceed $500 for each dependent in grades K to 6 and $700 for each dependent in grades 7 to 12, for tuition, textbooks and transportation of each dependent in attending an elementary or secondary school situated in Minnesota, North Dakota, South Dakota, Iowa, or Wisconsin, wherein a resident of this state may legally fulfill the state's compulsory attendance laws, which is not operated for profit, and which adheres to the provisions of the Civil Rights Act of 1964 and chapter 363. As used in this subdivision, "textbooks" shall mean and include books and other instructional materials and equipment used in elementary and secondary schools in teaching only those subjects legally and commonly taught in public elementary and secondary schools in this state and shall not include instructional books and materials used in the teaching of religious tenets, doctrines or worship, the purpose of which is to inculcate such tenets, doctrines or worship, nor shall it include such books or materials for, or transportation to, extracurricular activities including sporting events, musical or dramatic events, speech activities, driver's education, or programs of a similar nature.

Minnesota Stat. § 290.09, subd. 22 (1982). The Court found that all three parts of the *Lemon* test were satisfied. This court will use the *Mueller* decision as a reference point in analyzing the Iowa statute under the *Lemon* test.

The first part of the *Lemon* test, a secular legislative purpose, is satisfied. The same secular legislative purpose underlies the Iowa statute as the Minnesota statute. As the Supreme Court said in *Mueller:*

A State's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—evidences a purpose that is both secular and understandable. An educated populace is essential to the political and economic health of any community, and a State's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the State's citizenry is well educated. Similarly, Minnesota, like other States, could conclude that there is a strong public interest in assuring the continued financial health of private schools, both sectarian and nonsectarian. By educating a substantial number of students such schools relieve public schools of a correspondingly great burden—to the benefit of all taxpayers.

*Mueller,* 463 U.S. at 395, 103 S.Ct. at 3067.

In *Mueller,* the Supreme Court found several features of the Minnesota tax deduction particularly significant in concluding that the second part of the *Lemon* test, that the legislation's principal or primary effect must be one that neither advances nor inhibits religion, was satisfied. The Court noted that: the deduction was only one among many deductions allowed under the Minnesota income tax law; traditional-

ly legislatures have especially broad latitude in creating classifications and distinctions in tax statutes; the Minnesota legislature's judgment, that a deduction for educational expenses fairly equalizes the tax burdens of its citizens and encourages desirable expenditures for educational purposes, was entitled to substantial deference; the deduction was available for educational expenses incurred by all parents, including those whose children attend public schools and those whose children attend nonsectarian or sectarian private schools; the aid went to parents of schoolchildren rather than directly to the schools; the financial benefit resulting to parochial schools was attenuated; and the benefits of the law "can fairly be regarded as a rough return for the benefits * * * provided to the State and all taxpayers by parents sending their children to parochial schools." *Id.* at 396–402, 103 S.Ct. at 3067–71. The same significant features characterize the Iowa law.

Plaintiffs argue that certain differences in the Iowa law require a conclusion about the second part of the *Lemon* test different from that reached in *Mueller.* The Minnesota statute provides for only a deduction, not a tax credit. Plaintiffs rely heavily on *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), in arguing that the tax credit feature of the Iowa law violates the Establishment Clause. *Nyquist,* which invalidated a New York statute, is distinguishable. The New York statute provided for direct money grants to nonpublic schools, a tuition grant program for tuition reimbursements to qualifying parents of children attending nonpublic schools, and a form of tax relief for those who failed to qualify for the tuition grant program. It is the latter aspect of the New York law that must be examined. The Supreme Court noted that the law provided that parents who failed to qualify for the tuition reimbursement

> may subtract from their adjusted gross income for state income tax purposes a designated amount for each dependent for whom they have paid at least $50 in nonpublic school tuition. If the taxpayer's adjusted gross income is less than $9,000 he may subtract $1,000 for each of as many as three dependents. As the taxpayer's income rises, the amount he may subtract diminishes. Thus, if a taxpayer has adjusted gross income of $15,000, he may subtract only $400 per dependent, and if his adjusted gross income is $25,000 or more, no deduction is allowed. [Footnote omitted.] The amount of the deduction is not dependent upon how much the taxpayer actually paid for nonpublic school tuition, and is given in addition to any deductions to which the taxpayer may be entitled for other religious or charitable contributions.

*Id.* at 765–66, 93 S.Ct. at 2961–62.

In *Nyquist,* the parties and the Solicitor General, in an amicus curiae brief, engaged in debate over what label to put on the New York tax relief provision. Appellants argued that it provided tax "credits;" the state and intervenors argued that it provided a system of income tax "modification;" and the Solicitor General argued that the law authorized tax "deductions." In form, it was a tax deduction, but the district court in *Nyquist* concluded that it was more like a tax credit because the deduction was not related to any amount actually spent for tuition and was apparently designed to yield a predetermined amount of tax "forgiveness" in exchange for performing an act the state desired to encourage. The Supreme Court declined to give it a label, pointing out that in any event the constitutionality of the law did not turn on any label it might select. *Id.* at 789, 93 S.Ct. at 2973.

In holding that the tax relief aspect of the New York law violated the second part of the *Lemon* test, the Court emphasized that the amount a taxpayer was allowed to deduct was unrelated to the amount of money actually expended by the parent on tuition. The Court noted that the formula was apparently designed to assure that each family would receive a carefully estimated net benefit, and that the tax benefit would be comparable to, and compatible with, the tuition grant for lower income families. The Court concluded that in prac-

tical terms there was little difference, for purposes of determining whether such aid had the effect of advancing religion, between the tax benefit and the tuition grant. *Id.* at 790–91, 93 S.Ct. at 2974–75.

The Iowa statute is substantially different from the New York statute. The Iowa statute allows a taxpayer who itemizes deductions to take an extra deduction, not to exceed $1,000 per dependent, for amounts actually paid for tuition and textbooks, and allows taxpayers who use the standard deduction to claim a tax credit of 5% of the first $1,000 actually paid for tuition and textbooks for each dependent. The tax credit is merely a means of assuring that those taxpayers who use the standard deduction gain the same type of tax benefit based on actual payments for tuition and textbooks that itemizing taxpayers gain. The amount of the tax benefit works out to be about the same, whether it is reached by deduction or by tax credit. As a matter of methodology, the legislature could have provided that a taxpayer taking the standard deduction would be allowed to take, in addition to the standard deduction, a special deduction for payments actually made for textbooks and tuition, but that no doubt would have seriously complicated the income tax return forms and the accompanying instructions to taxpayers. It would have been confusing to taxpayers who use the standard deduction to understand that they could nevertheless take a "deduction." Providing a "tax credit" in the amount of 5% of actual tuition and textbook payments provided an uncomplicated way of doing it.

■ The "tax credit" label simply does not govern resolution of the issue. The Iowa law bears a far greater resemblance to the Minnesota law upheld in *Mueller* than to the New York law provisions condemned in *Nyquist.* Extending the tax benefit by way of a tax credit to taxpayers who use the standard deduction does not run afoul of the second part of the *Lemon* test.

■ Plaintiffs also contend that the Iowa law runs afoul of the second part of the *Lemon* test because it discriminates against religious educational ministries.

The Establishment Clause mandates governmental neutrality among religions, and a law that grants a denominational preference is one that advances a particular religion and therefore violates the Establishment Clause. *Larson v. Valente,* 456 U.S. 228, 246, 102 S.Ct. 1673, 1684, 72 L.Ed.2d 33 (1982). Plaintiffs contend that the Iowa law preferentially discriminates by reason of the fact that the benefits of the law are available only to parents of dependents attending accredited schools, and are not available to parents of dependents attending schools that are not accredited.

This facet of plaintiffs' attack on the statute must also fail. The Supreme Court said in *Mueller:* "Our decisions consistently have recognized that traditionally '[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes,' *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983) * * *." 463 U.S. at 396, 103 S.Ct. at 3067; *see also Madden v. Kentucky,* 309 U.S. 83, 87–88, 60 S.Ct. 406, 407–08, 84 L.Ed. 590 (1940). The Iowa legislature has not discriminated on the basis of religion or viewpoint or the exercise of First Amendment rights against taxpayers whose dependents attend nonaccredited schools. The tax law, instead, is an encouragement of an activity deemed to be in the public interest, i.e., attendance at an institution which meets the state educational requirements of an accredited school. This is a valid governmental interest and the statute's accredited school classification rationally serves that interest.

■ Plaintiffs assert that the Iowa deduction/credit law fails the third part of the *Lemon* test, that the law must not foster an excessive government entanglement with religion. Plaintiffs argue that because the law excludes tuition payments for the expenses which "relate to the teaching of religious tenets, doctrines or worship, the purpose of which is to inculcate those tenets, doctrines, or worship," the Department of Revenue and Finance will necessarily become excessively entangled

with religion in the process of enforcing this limitation.

The Minnesota statute in *Mueller* contained such a limitation in respect to payments for textbooks, but not in respect to payments for tuition. In Minnesota, the full amount of tuition was deductible, even though most schools receiving tuition payments had mandatory courses in religion and conducted religious exercises. Thus, the excessive entanglement argument in the Minnesota case was limited to the textbook aspect. The Supreme Court had "no difficulty" in concluding that the Minnesota statute in respect to the textbook limitation did not excessively entangle the state in religion. *Mueller*, 463 U.S. at 403, 103 S.Ct. at 3071. Because the Minnesota statute did not have a similar limitation in respect to tuition, the Supreme Court did not have occasion to decide whether a limitation in respect to tuition would trigger excessive entanglement.

The approach the court is required to take regarding the excessive entanglement issue is articulated in *Lemon* at 615, 91 S.Ct. at 2112:

> In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority. Mr. Justice Harlan, in a separate opinion in [*Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)], echoed the classic warning as to "programs, whose very nature is apt to entangle the state in details of administration...." *Id.*, at 695, 90 S.Ct. at 1425.

As I previously noted at page 1038 of this memorandum opinion, and as the Supreme Court noted 463 U.S. at 399–400, 103 S.Ct. at 3069–70 of the *Mueller* decision, the benefits of the deduction/credit law go to the parents of schoolchildren rather than to the schools. Their "character" is that of human beings and their "purpose" is to educate their children. Any financial benefit resulting to the schools is secondary and attenuated. The church-affiliated schools (the secondary and attenuated beneficiaries) do have a religious character and do have as one purpose aiding the students in their religious development. The schools provide courses in religion, have religious symbols on the school premises, some open classes with a prayer, some provide religious exercises, such as a weekly mass, and commonly incorporate religious values into the process of teaching all subjects.

The "nature of the aid that the State provides" is a tax benefit to the parents based on tuition they pay for school expenses that "relate to the teaching only of those subjects legally and commonly taught in public elementary and secondary schools." Excluded from the tax benefit is tuition for expenses that "relate to the teaching of religious tenets, doctrines, or worship, the purpose of which is to inculcate those tenets, doctrines, or worship." As *Mueller* established, the nature of the aid is clearly benign in terms of Establishment Clause concerns.

What about the "resulting relationship" between the state and the parochial schools? Plaintiffs argue that in order to enforce the limitation in respect to tuition, the Department of Revenue and Finance will have to actively monitor and inspect the classroom activities of church-affiliated schools to make sure that deducted tuition money is not used for expenses that "relate to the teaching of religious tenets, doctrines, or worship, the purpose of which is to inculcate those tenets, doctrines, or worship * * *." Such monitoring and inspection, plaintiffs argue, would constitute excessive entanglement.

If such active monitoring and inspection were required, it might well constitute excessive entanglement. No such active monitoring or inspection, however, is required or is contemplated. The regulation that is set forth in paragraph (16) of the Findings of Fact, *supra*, is a reasonable and common sense approach to implementing the law. It simply provides for a proration based on time the student spends in religious instruction classes and in classes for subjects legally and commonly taught

in public schools. The regulation is enforceable without on-site monitoring.

Plaintiffs contend, however, that on-site monitoring is needed because incorporating religious values into the process of teaching subjects legally and commonly taught in the public schools, which does commonly occur in parochial schools, means that the expenses of teaching those subjects are expenses that "relate to the teaching of religious tenets, doctrines, or worship, the purpose of which is to inculcate those tenets, doctrines, or worship." I disagree. To some degree, imparting values, religious or secular or both, is normally a part of the teaching process. Incorporating religious values into the teaching of a subject does not change the subject into a religious indoctrination subject. The subject is still, for example, algebra, U.S. history, chemistry or American literature, and the dominant purpose of the course is to teach the subject.

Furthermore, the Department of Revenue and Finance not only has no need, but the record fails to disclose that it has any plans, much less the capacity, to actively monitor and inspect the teaching of subjects in accredited schools. Occasional tax audits will be audits of the taxpayer, not the school attended by the taxpayer's dependent. If the deduction or credit is questioned, the taxpayer, not the school, will have to substantiate it. The danger of parochial school records being subpoenaed in connection with the audit of a tuition deduction appears to be minimal, if not non-existent—certainly no greater than the danger of a subpoena to a church for records in connection with a claimed deduction of a charitable contribution to the church. The specter of hordes of revenue agents going forth to monitor parochial school classes simply does not reasonably and fairly arise from the deduction/credit law or the regulations issued thereunder.

The cases relied on by plaintiffs, including *Lemon* and *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), are cases where the challenged law created a direct aid of some kind to parochial schools and where "[a] comprehensive, dis-criminating, and continuing state surveillance will inevitably be required * * *." *Lemon*, 402 U.S. at 619, 91 S.Ct. at 2114. The Iowa deduction/credit law does not create any kind of direct aid to parochial schools, nor does it create any kind of relationship between the state government and the parochial schools. The sole relationship involved is between the state and its taxpayers. There simply is nothing about the very nature of the Iowa law that is apt to entangle the state in religion to any appreciable degree.

Plaintiffs also argue that the excessive entanglement part of the *Lemon* test is violated because the deduction/credit law requires that the schools adhere to the provisions of the federal and state civil rights acts. Plaintiffs suggest that the Department of Revenue and Finance will have to intrusively monitor and investigate the parochial schools to make sure they do adhere to those civil rights laws. Again, there is no need or plan for the Department of Revenue and Finance to conduct investigations of that sort. Other government agencies are charged with responsibilities in that area.

■ Lastly, plaintiffs contend that the law creates excessive entanglement because it has fostered the creation of political constituencies defined along religious lines. This contention is without merit. As Justice Powell said:

> The risk of significant religious or denominational control over our democratic processes—or even of deep political division along religious lines—is remote, and when viewed against the positive contributions of sectarian schools, any such risk seems entirely tolerable in light of the continuing oversight of this Court.

*Wolman v. Walter*, 433 U.S. 229, 263, 97 S.Ct. at 2593, 2613, 53 L.Ed.2d 714 (1977) (Powell, J., concurring in part, concurring in judgment in part, and dissenting in part). Furthermore, the Supreme Court in *Mueller* stated that the "politically divisive" variation of the excessive entanglement part of the *Lemon* test is "confined to cases where direct financial subsidies are paid to parochial schools or to teachers in parochial

**1042**

schools." *Mueller*, 463 U.S. at 404 n. 1, 103 S.Ct. at 3072 n. 1.

The third part of the *Lemon* test, like the first and second parts, is satisfied.

### CONCLUSION AND ORDER FOR JUDGMENT

The court concludes and adjudicates that Iowa Code sections 422.9(2)(f) and 422.12(2) and the regulations issued thereunder do not violate the Establishment Clause of the First Amendment to the United States Constitution.

IT IS ORDERED that judgment be entered accordingly and that plaintiffs' complaint be dismissed at their costs.